Callaway Golf v. Acushnet Company May it please the court, Henry Bunso for Acushnet Golf. The determinative legal issue on this appeal is whether it would have been obvious in late 1995 to use a well-known polyurethane cover material. You're giving up on the anticipation argument? We're not giving up on the anticipation argument. That went by way of summary judgment. We are appealing the grant of summary judgment on anticipation. On NISBET, which is the source of your anticipation argument. If I understand correctly, I've got two problems. One is you've got to convince us that the Molitor patent was incorporated, that the polyurethane reference in there was incorporated, right? And in addition to that, you've got to show that the Sure D64 hardness test was satisfied, was inherent in the NISBET patent, correct? Yes. And if I understand correctly, and tell me if I'm wrong, your only argument for inherent anticipation rests on these test balls that were created under McKnight's supervision, correct? That's the only argument. On the anticipation issue, not obviousness. On the anticipation issue. That's an essential ingredient, correct? With one caveat. Because the foamable compositions of the Molitor patent that was incorporated into NISBET, and it was incorporated using language from Enray Voss, which was the appropriate language at the time, a person of ordinary skill in the art would know that those foamable compositions clearly have softness limitations of less than Sure D64. There's no magic to the Sure D64. Did you put in an expert declaration in opposition to the summary judgment motion saying that? I don't believe we did. Well, then I don't see how you can rely on it. I think it's inherent in the art, Your Honor. Inherent despite any direct statement in the reference to that effect? I believe that's true. If you are one of ordinary skill in the art, and the person of ordinary skill in the art wasn't contested, it was a golf ball designer, and a golf ball designer with the teaching of NISBET, and remember NISBET says that it must have a soft outer cover. Let's assume we reject that argument, okay? Okay. And that we say that you've got to rely on the test ball, right? Right. I find the record very confusing about what the judge was saying about the test ball that was being used in connection with the anticipation issue because she seems to say, well, I haven't found incorporation, therefore the test balls aren't relevant. What do you understand her ruling, her grounds for rejecting the test ball in the anticipation context were? I believe that is the sum and substance in the anticipation context. I believe she said that the reference was not sufficient for incorporation, and therefore we never really got there in terms of the actual test balls. At the time of trial, she first criticized Mr. McKnight because he couldn't sponsor the test balls, not having made them himself, but we offered testimony from Mr. Dalton, for example, as to their actual construction, their actual construction in conformance with the patent. So we had an evidentiary predicate that would have allowed the admission of the test balls. Dr. Statz could have opined about them at the time of trial, but all that was kept out by the court. Okay. On the obviousness issue, the court made three fundamental errors, we believe, and I'd like to review those. First of all, the court held that in order to grant a judgment as a matter of law, finding obviousness, that there must be proof of motivation to combine. The second is the court stated in her decision that when there... Is that part of the jury instruction? You didn't challenge the jury instruction, right? You're saying that she shouldn't have required motivation to combine. What was the jury instruction? The jury instruction said that that was one of the criteria that the jury should take into consideration. Our problem with the judge's ruling on JMAL is that she said it was a sine qua non to establishing obviousness, and in fact, she went further than that and said that in this case, where there was expert testimony from Dr. Rising, that there was no motivation to combine, that that created a, quote, almost insurmountable burden to establishing obviousness, and that is not the law. It's not been the law since KSR. In fact, the PharmaSTEM case, which this court recently decided, explicitly said that when the references themselves contradict expert testimony, and that is the situation in this case, that the expert testimony is not substantial evidence to support the jury verdict or to support the legal conclusion of obviousness. I'm having trouble seeing why the jury couldn't conclude here that there was a lack of motivation to combine. They shouldn't have concluded that there was a lack of motivation to combine because there was not substantial evidence to support that decision. When the district court reviewed the implicit finding, and of course it is an implicit finding because there was no explicit finding. What compelled the jury to find that there was a motivation to combine? I don't understand that. I'm sorry? What compelled the jury to find a motivation to combine? The Wu patent and the Molitor patent, both of which say explicitly, Wu explicitly in column one in the second paragraph of the patent says, use my polyurethane cover on solid golf balls. Molitor 751 incorporates the Nesbitt patent explicitly. And Molitor 751 is indisputable, a patent that talks about using polyurethane covers on golf balls, and it explicitly incorporates it. Isn't there an absence of specific reference to the Sure-D hardness requirements? No. In the Molitor 751 patent at column three, it specifically talks about Sure-C measurements of 72 to 76. But that's Sure-C, not Sure-D. Absolutely. And there's a dispute about that, which really should be nonexistent, because the patentee himself... I don't mean to interrupt, but nonetheless, we're talking about what the jury might have been persuaded to conclude. Could they have not been persuaded to conclude that even though there's a Sure-C hardness specification, that that doesn't necessarily convert to a Sure-D standard? And the answer is no. And the reason it's no, and that is not substantial evidence that supports the jury verdict, is because the patentee used that correlation himself, not only in front of the patent office to get the patent to issue, but it's in column three of all of the patents. There is a direct correlation. It says a Sure-D measurement, i.e. Sure-C, and it's not a close issue here. But there was testimony on the other side, was there not, about the absolute obvious correlation that you're claiming between Sure-C and Sure-D? There was testimony to the effect that the ASTM tables, for example, are not a direct correlation. And I think if this was a close case, they would have a better argument. But it is not a close case. Suppose we decide it is a close case. I don't believe you could. I think there is no evidence in the record to indicate that it is a close case. When you look at the Sure-C measurements that we're talking about, and you look at the ASTM standard, you look at the charts that the patentee relied upon before the patent office, and you look at the correlation, the direct correlation, you use the word I.E. in other words, the direct correlation that the patentee used, you see clearly that, for example, the Molitor 72 to 76 is well below Sure-D of 64. It's in the 50s. But there's more than that if you're looking for a reference of Sure-D less than 64. Mr. Dalton's testimony, which I will refer you to. Was he your witness or theirs? Mr. Dalton was our witness, but he testified to existing balls at the time. There were four balls at the time, all of which were in the marketplace. There's no dispute about that. All of which had Sure-D measurements far less than 64, some in the 40s. The Bellotta balls, some of the Bellotta balls were in the 40s. The idea that a designation of Sure-D less than 64 is somehow inventive is simply belied by the record. Bellotta balls had been out in the marketplace for years and years and years. I'm sorry to interrupt, but before your time runs out, I want to reach another issue in this case, which is the matter of irreconcilable verdicts. Thank you. And one of the arguments with respect to that is that your argument was waived in this case by your failure to object. And it strikes me, reading the transcript, that the court says, I'm not going to do this. And then she says, all right. Now, I wasn't there to observe her demeanor or who she looked at. But it strikes me that when someone says, all right, they're open at least. That's your opportunity to come in and say, no, it's not all right. And your side, at least in this whole colloquy, was silent. Why isn't that a waiver? It's not a waiver for several reasons. The first reason is that under Third Circuit law, waiver is disfavored. And the only cases that I've seen that hold a waiver under Third Circuit law are cases when there is some affirmative conduct. In other words, I affirmatively made a representations to you, told you, and now I'm trying to run away from it. That's not the situation. In this case, if Mr. Scherkemach and the other side had not raised this, so no one had raised this beforehand, would you agree then that there would have been a waiver? I don't think there would have been, no. I don't think there would have been. There clearly was not in this case. Because it depends what the court did. I mean, if the court says directly, I see the issue. The whole point of waiver is to give the court notice and opportunity to correct the mistake. Right. And the court says, counsel, is there anything we need to address before we dismiss this jury? Correct. Do you not agree that this issue, the argument that there was an irreconcilable verdict, was one that this was the time to raise it? It was an obvious one to raise at this time. Absolutely. Right. And therefore, if no one had spoken up at that time, would the issue be waived? I'm not sure it would have been waived at that time. I think it would have depended on what the court did at that time. The court read the verdict. The whole point of waiver is to- She says, is there anything we need to address before we dismiss the jury? Correct. No one says anything, so she dismisses the jury. Right. I think this would be a much better case for a waiver if that's what happened. That's not what happened. Did the district judge here on the post-trial motions find that there was no waiver? Yes. The district court explicitly found that there was no waiver in this situation. Well, I mean, you say explicitly found. I mean, we can ask Mr. Scherkemacher what he thinks about that language. Do you think that language is absolutely clear in terms of a finding? I believe that's what the Jamal opinion says, that she finds that there was no waiver in this circumstance. What page? What he says is the court is sensitive to the argument. That's all I could find on page 11 of the opinion. I would refer you to JA 902 to 903, which is the transcript of that. As far as the opinion itself, I'll certainly have that for you when I stand up for rebuttal. Even in that colloquy, though, there's no ruling on waiver. There's simply a colloquy that the issue was raised that there was an inconsistency. And then Callaway's counsel says the issue is one claim, which they found invalid as a dependent claim. The court says, all right, do you want to send them back? Callaway says, I'm not sure they understand. The court says, I'm not going to do this. All right, just wanted to raise it. So the existence of an inconsistency was made apparent to her at that time. Neither side sought to have the jury go back and resolve this inconsistency. Well, with all due respect, Your Honor, the court preempted either side from going further at that point. I mean, the court saw the inconsistent verdict when she first read it. You have to assume that she recognized it when she read it. Secondly, she asked if there was anything further. It was brought to her attention. As she said, Callaway beat Acushnett to the punch in that regard. The whole purpose of finding waiver. Well, they beat Acushnett to the punch in terms of raising the inconsistency. Yes. But neither side requested that the judge send the jury back to resolve that inconsistency while the opportunity was there. Because she said, quote, I'm not going to do that. All right. That's what she said. I mean, she said, I'm not going to do that. All right. Isn't that inviting the parties, one or both of them, to tell her why she should do it? It depends if all right is a question mark asking further comments or simply a declarative statement. Well, the problem is all we have is a transcript that says all right with a question mark. I agree. But you have to look at what the ultimate purpose of waiver is. And the purpose of waiver is to avoid courts making errors that they're not aware of. There was no notice requirement here. Well, can I get back to Judge Dyke asked the question about whether I think whether the district court judge actually decided the waiver issue or not. Correct. And the only thing I find in the opinion is she says, although it's clear defendant never objected to the verdict on the record, the court is sensitive to its argument that it was beaten by the punch. Is that what you view is her entire holding on this issue of waiver? Yes. It's a 70 to 72. That's right. And I think that conveys to the reader that she knew about the issue. She decided what she was going to do about it. She was not going to send it back and create more problems on Friday afternoon. Before you sit down. Yes, sir. I want to ask you one more question about the inconsistent verdict. I can understand your argument that the verdict on claim five and claim four of the 293 are inconsistent. That's clearly the case that they are consistent. You've got a problem in carrying that argument over to the claims of the other patents, though, it seems to me, because at least with respect to some of those claims, there is the with respect to the inner layer. There was an additional requirement in the patents of the combination of anonymous. So why can't we look at these verdicts on those other claims, having the anonymous combination in them and say, OK, well, here's another reason that the jury might have found those claims non-obvious. So the verdict with respect to claim five and those other claims are not inconsistent. What's your answer to that? Several answers. First, there were terminal disclaimers going back to the 293 patent as a result of a double patenting rejection that says that the claims, therefore, are coextensive in terms of scope. Second, those ionomer blend limitations were never argued in the trial to the jury as a basis for distinguishing them from any of the other claims. Third, those ionomer blend limitations are shown in the Proudfit prior art, which is why they were never argued as being distinctive. So there's no basis for finding any substantial evidence to support an implicit finding that the jury found a difference between the claims and, therefore, validity of some and not the other. That is why there was no JAMAL filed to overturn the obvious misfinding on claim five of the 293. There was no JAMAL finding. That's not before this court. In other words, you have to assume that the implicit findings that supported obviousness of claim five of the 293 patent are adequate. That's the record before you. That's where we are. This is an inconsistent verdict. To do anything other than retry this case or grant JAMAL of obviousness for all the claims would clearly trench on our Seventh Amendment rights, and that's what the Micogen case says. Okay, Mr. Ponce, thank you very much. Thank you. Again, we've run over time-wise, but I'll restore your five minutes for rebuttal. Thank you very much. And Mr. Shurkenback, we'll give you an additional seven minutes. Thank you, Your Honors. Good morning. May it please the Court. Frank Shurkenback of Fish and Richardson for Callaway Golf. If I could deal with the issues in reverse order and just focusing on the questions that you've asked. First of all, an inconsistent verdict. To start with the last point first, counsel. Well, the first point is you agree there's no dispute that the verdicts were inconsistent. Correct. We never disputed that in the district court. You can't find the independent claim valid and the dependent claim invalid, and that's what happened here. And the question is what do we do about it? What about the other claims? Do you agree that they're inconsistent, the verdicts? No. No, they aren't. You asked the question about the blend claims or these five other claims. So we made the argument that those are distinct in any event from the claims at issue with the allegation. But just to be clear where we are, with respect to the claims other than the blend claims, you agree that the verdict of non-obviousness with respect to Claim 4 and the other non-blend claims is inconsistent with the verdict on Claim 5. Yes. So what we're talking about is you're trying to say that non-blend claims. I mean the blend claims, excuse me. Correct. You have to be careful the way we phrase it. We're not arguing that you can reconcile what the jury did on Claim 5 and 293 necessarily by reference to the blend claims. The blend claims are just different. They have an additional limitation. There was substantial evidence to support the jury's implicit finding that those claims were not obvious. Even if Claim 5 was obvious? Absolutely. Absolutely. Expand on that a little bit. Well, for one thing, this case is not all about just finding in the prior art an outer cover that has a short E-hardness of 64. With all due respect, that's a Cushnet's spin on what the invention is for purposes of appeal. These claims are to a golf ball that has a whole bunch of characteristics, one of which is an outer cover that has a certain short E-hardness. I'm confused. I thought that you agreed that the verdict on Claim 5 was inconsistent with the verdict on Claim 4 and all the other non-blend claims. Yes. We're dealing with the blend limitation as potentially saying that the verdict on these blend claims was not inconsistent with the Claim 5 verdict. Correct. Explain to me why that's true with respect to that blend limitation. Okay, because this is the blend of low acid ionomers in the inner cover layer. It is an additional substantive limitation of one of the sets of claims. There's a great deal of disclosure about it in the 293 patent. Some of the prior art references disclosed that element. Some didn't. A Cushnet at trial relied on different combinations of references, some of which had the blend. What about the double patent rejection? Council argues that that's a concession, that there was no patentable distinction, but I don't believe that's true as a legal matter. The jury was certainly free to find and did find, based on substantial evidence, that the addition of the blend limitation mattered. For example, the Nesbitt patent, which they've abandoned now on appeal as an obviousness combination, but in the trial court it was one of their obviousness combinations, has no blend in the inner cover layer. Proudfit does. None of the other references has a blend in the inner cover layer. The jury could have decided that, for example, there was no motivation to combine specifically Proudfit with the other references that a Cushnet tried to combine it with. There was substantial evidence in the record to support that as we laid out in our brief. So you've got a whole smorgasbord of combinations that a Cushnet relied on, some of which had this limitation, some of which did not. What about the waiver? Right, so the waiver. We think there was a waiver, and we made that argument below to Judge Robinson, and I don't believe she actually decided there was not a waiver. What she said was, I'm sensitive to the concern that a Cushnet was beaten to the punch, period, full stop. But then she went on to reach the other issue. So if she had found there was a waiver, she wouldn't. So can't we read into that the fact that she obviously thought there was no waiver? Well, I don't think actually, I don't think Judge Robinson made the decision or reached a determination that Third Circuit law specifically required an objection or a waiver would result. So for two reasons, it actually wasn't clear to us what her ruling was. Number one, does Third Circuit law actually require an objection to be made when you've got inconsistent general verdicts? Actually, there's not a holding directly on point on that issue. We cited the Loffman case. Cushnet cites it for a different proposition. But the Loffman case says probably yes, but it's dicta. And second of all- The question is, what's the purpose of having an objection? It's to alert the district court to the inconsistency so the district court can cure it at the time before the jury is discharged. But here, she was made aware of the inconsistency, right? She could have done something. She was, but the policy underlying waiver is broader than that, Your Honor. This was a game time decision, right? It's the fourth quarter of the NBA playoff game. The jury's in the box. We raise our hands and say, there's an inconsistency, Judge. And we request a sidebar to ask her to do something about it. And the decision could have been very different if she had been faced with two parties telling her, yes, Judge, there is an inconsistency. And we do want you to send the jury back. How do we know that, that it could have been very- I mean, it could have been, and it could have been a lot of things. But it could have not been. How are we supposed to conclude that? At some level, you can't. I mean, there is a certain sense of you had to be there. But even on this record, it's clear she heard us out. She turned to all counsel and said, what do you want me to do? Do you want me to do this? And there was met with silence by Akushnett. And this has happened immediately in the courtroom. She said, I'm not going to do that. Now, if Akushnett had said, Judge, we really agree with Callaway that you really should send this back. It's an inconsistency. We can fix it now. The judge may have made a different decision. You can't know, and I can't know. But that's why waiver matters. That's why it should apply here. Well, assuming that we construe her language in the Jamal opinion as being the decision that there was no waiver. Yes. That decision is entitled to deference, is it not? I mean, on what level do we review that? Is it entitled to deference? Is that an abuse of discretion? You know, with all due respect, I think it was. First of all, I'm not sure that the standard is abuse of discretion on reviewing a decision of whether a party waived an objection or not. If I think of the many cases both sides have cited on this issue, I don't think that question is answered clearly. But with all due respect, I think it was an abuse of discretion because the policy is very clear and very strong in all these cases that the first thing that should happen is you try to get the jury to fix it. You re-instruct them. It was an agreed inconsistency. But in terms of whether she closed the thing off by saying, all right. She's in a better position to know what she intended than we are, right? I can agree with that. Absolutely. Yes. Yes. Yes. This could have been resolved one way. This potentially could have been resolved if you all on your side had gone to Jamal on the defendant's claim for it. Well, we could have. But of course, the law is very clear that there was, in our view, no reason for us to do it. Because if you have inconsistent general verdicts, which we have here, the framework is very clear that they can be left alone. I don't think that's – I think you've got a hard case to make on that. They can be left alone under some circumstances. Yes. But the Third Circuit has said that, you know, looking at Justice Stevens' dissent, that there are four criteria that you look at. So it's not just we don't worry about it. They do worry about it. I don't mean to be cavalier with all due respect. And it's not a trivial question, frankly. It's not one that any of us probably sees a whole lot of. But I do believe if you look at Justice Stevens' dissent in Los Angeles v. Heller, if you look at the cases he cites, the general rule seems to be reasonably clear that if you have general verdicts as opposed to special factual findings by the jury, one legitimate outcome is to enter judgment on all those verdicts and you can leave the inconsistency alone. In fact, this Court didn't really address this specific question. There's no indication this was a compromise verdict, right? Well, again, who knows, right? There's no way to – There's no evidence that it was. Or that it wasn't. With all due respect, Your Honor, and, you know, the Dunn Court, the seminal Supreme Court case on this issue,  You haven't argued, or did you argue in the Jamal context that this was a compromise verdict? Well, we argued that it might have been. But, again, we were quick to say it didn't matter whether it was found to be a compromise or not because the law actually precludes anybody, including this Court, from speculating as to whether it was or it wasn't. All we know is it happened. And the question is, what's the implication of that? Does it require a new trial? And you will not find a single case from any court, Supreme Court, any circuit court, that orders a new trial where you have inconsistent general verdicts. There's no such case. In fact, to the contrary, there are cases where it's left alone. This Court, just to point out two cases, they're not on all fours factually, but there's the Mendenhall case, which we cite, in which this Court acknowledged on appeal, yes, there were at least two inconsistencies that could not be reconciled, and yet affirmed the decision not to order a new trial. So we know it's okay per Mendenhall. And then there's the Ellen W. case of this Court, in which this Court affirmed a judgment where a dependent claim was invalid and the independent claim was valid. Exactly our facts. And this Court said, that's okay. Affirmed. So in the face of those actual holdings, and in the face of no conflicting authority, I don't think on the inconsistent verdict question that it's a real close call. I mean, the problem is we have to follow Third Circuit law. Yes. And they've made very clear that at least sometimes inconsistent verdicts must result in a new trial in the Mosley case, right? Yeah, absolutely. Yes. So we've got to figure out whether this is one of those situations. We can't just say, oh, well, we're not finding a lot of cases where they actually didn't order a new trial. We've been given a standard in the Mosley case, and we've got to apply it here. Correct. But the Mosley case is talking about, and as is Justice Stevens' dissent in Los Angeles v. Heller, is talking about inconsistent verdicts in general. And there are different kinds of inconsistent verdicts. There are general verdicts. Yeah, but Mosley says in the case of inconsistent general verdicts, under some circumstances, you've got to have a new trial. Actually, I don't believe it says that. I think Mosley is dealing with the waterfront and is dealing with if you have inconsistencies in special verdicts. Rule 49B does not address the issue before us here, that of inconsistent general verdicts. That's on page 90. Right. So the Mosley – They're saying this is a case about inconsistent general verdicts. Here are the standards for inconsistent general verdicts. I don't see how you can argue that Mosley wasn't dealing with inconsistent general verdicts. I'm sorry. I'm not being clear. It clearly was dealing with inconsistent general verdicts. In fact, Mosley is the only Third Circuit case that's been cited to you that is a general verdict case. All the other cases that Acushnet cites are Rule 49 special verdict cases, a different animal. My point only is that Mosley discusses both special and general, and the rules are different for special verdicts than they are for general verdicts. And in the case of a general verdict, one legitimate outcome is to affirm the judgment, not order a new trial, affirm the judgment, and leave the inconsistency alone. If the Mosley standard is set. Well, I don't think Mosley – yes, so far as it goes, I don't think Mosley sets out an independent substantive standard for whether you should leave it alone. The case does. It says where the verdict appears to be the result of compromise as opposed to jury confusion. So that seems to be the standard. Well, with all due respect, I don't think that can be the standard. I don't read Mosley to say that, but we know from this – first of all, we know no one knows the answer to that question. I mean, obviously, we can't know why the jury reached the result it did, whether it was a compromise, they were properly instructed, there's been no objection to the jury instructions, or whether they made a mistake or whether there was some other reason that none of us has thought of. And the Supreme Court in Dunn says you can't engage in that exercise. It's not appropriate, probably because there is no answer and there is no way to know. Basically, if there's no Seventh Amendment problem, and the Seventh Amendment problem only arises if you've got special verdicts that conflict with one another, because then you have factual findings that are conflicting. No court can then resolve that conflict consistent with the Seventh Amendment. That's when you have to order a new trial or do something else. But if it's a general verdict on legal issues like obviousness, that's a different animal and it can be left alone, and those differences are reflected in Rule 49 itself. If I can – Judge Dyke, you asked a question at the outset. I'm not sure you got a clear answer to it. I want to be sure you did on this, the test ball evidence. Yeah. So Judge Robinson excluded it for two separate reasons. The first was that it was originally offered through the vehicle of an expert, Dr. McKnight. We brought a dog-ear motion saying that essentially Dr. McKnight didn't have anything to do with those balls. When she ruled on the McKnight testimony, she excluded the McKnight testimony on the ground that he didn't do adequate supervision. Correct. She didn't exclude the balls, and there was testimony by – Mr. Dalton. Dalton, who did the testing on the balls. She didn't exclude that testimony and she didn't exclude the balls at that point, right? She issued a conditional ruling. She said to the extent you want to offer these, you can't get them into evidence through Dr. McKnight because there's no foundation. If you want to try some other way, basically I'll deal with it when it comes up. And they did subsequently try another way at trial through Mr. Dalton. And then it was a straightforward 403 analysis. Yeah, but that 403 analysis wouldn't necessarily apply in the anticipation context. In other words, she was dealing with obviousness. And I do think finding that the introduction of the balls would be unduly prejudicial and confusing in an obviousness case isn't necessarily going to lead you to a conclusion that the same thing would be true in an anticipation context. Procedurally, on the facts of this case, that might be true because anticipation was decided on summary judgment. We're talking about the exclusion of evidence at trial. The error assigned by a Kushnick is whether that evidence should have come in at trial. And to that extent, whether it's anticipation or obviousness, if that issue had been submitted to the jury, I think the analysis is the same. It's a straight up 403 analysis. This court has affirmed time and again the exclusion of evidence. It's an abuse of discretion standard. And I don't think particularly given the showing we made, it's a close call on this case. I don't know if there are any other questions the court has. I just wanted to touch on one key point on obviousness. And I'll sit down. Related, Judge Lindo, to a question you had, which is, and it relates to this hunt for a cover with a particular hardness in the prior art. One of the points I want to emphasize, because I think it's gotten lost in the briefing, this is not some combination patent in the sense that you've got an A and a B and a C. And if you can find them all separately in the prior art and have some motivation to combine them, we've got a KSR situation on our hands. This is a situation where a single thing is claimed, which is a golf ball, which is a complex structure that has multiple parts which interact with one another. And I won't go through it, but we've laid out in our briefs all the evidence showing the interaction between these layers on the balls and how complicated it is. So you can't say that even if they could find a construction with the right hardness in the prior art on the Molitor 751 ball, suppose it had the right hardness and the evidence is to the contrary, but suppose it did. That would not lead inexorably to a conclusion of obviousness because that construction of that ball is different. That's a two-piece solid core ball. That is not the claimed construction. So if you could theoretically peel that cover off of Molitor 751 and put it on the claimed construction, what would the hardness be? Nobody knows. So it isn't the case that Cushnet has set this up as if all we have to do is find that hardness on a cover and we're done. That isn't the case at all. If the Court has no other questions, I'll sit down. Thank you very much. Mr. Bronsow, you have five minutes for rebuttal. Thank you, Your Honor. On that last point, Judge Dyke asked if there was evidence in the summary judgment record of the softness of Molitor. Indeed, there was. At A5592, a spec sheet was introduced as part of the summary judgment record that established that the Molitor composition was 55D, well below the 64D requirement. This is not a case on obviousness. We're seeking to link together multiple references. This is the most straightforward obviousness case there can be. The ProudFit patent, unquestionably prior art, has everything in these claims except the polyurethane cover. Contemporaneous with ProudFit came Woo. Woo, an accutionate researcher, made the castable polyurethane compound that is clearly, by her own statements in her own patent, suitable for use on a solid-core ball. ProudFit is a solid-core ball. That's the connection. That's the teaching, suggestion, motivation to combine if we were before KSR that meets it. The Woo castable polyurethane was used on numerous balls that measured less than D64 on the ball. The title is professional, for example. It clearly would have been obvious to do that. Now, you have to also understand that when they're talking about other considerations of obviousness here, which I think is a big issue, there is no nexus between these supposed other considerations of obviousness. What this patent is, is a very broadly claimed landscape of a polyurethane cover. A couple of examples. The low end of the outer cover range is ten thousandths of an inch. That's less than the depth of the dimples. It couldn't possibly work. The upper end of the range is seventy thousandths. Twice the thickness of the Pro V1. Yes, the Pro V1 is a great golf ball and will be for a long time to come, we hope. But the fact of the matter is, there is no nexus, no correlation between what a Cushnet did and what the patent discloses. Probably a primary example of that is that the Callaway ball, the Rule 35 ball that supposedly practices these patents, it wasn't a ball, it was two balls. One for distance, one for spin and feel with a softer cover. So the idea that these patents were the holy grail or the solution to anything, is a great mischaracterization that has permeated this case. It's not it at all. There is simply no nexus. The district court relied first of all in denying our motion for judgment as a matter of law of obviousness, on a requirement for motivation to combine. That's not the law, but there clearly is a motivation to combine here. Secondly, she relied on the Sure D64 requirement, and we have shown in the record where that is rampant in the record. And I don't think I'm overstating it. It was in all the balls that Mr. Dalton talked about in his testimony. And finally, she explicitly did not consider our countervailing evidence when she was determining whether the implicit underlying findings to obviousness of the jury had substantial evidence support. And I think that's fatal to the determination of obviousness and denial of our JMO in this case. This is a very analogous case to your decision in Boston Science, SCIMED, where the same district court basically went through the same exercise. Now, when this court denied our JMO in this case, granted the court did not have the guidance of that opinion. But the law is as stated in the Boston Scientific SCIMED case. This court was obliged to consider all of the evidence, not just plaintiff's evidence. This court was obliged to consider what the references say, not a conclusory, bald statement from Dr. Risen that there was no motivation to combine. We know from your PharmaSTEM case that that is not sufficient evidence to support the verdict. There is not sufficient evidence to support the verdict in this case. That determination is a de novo review by you. The impact of the supposed commercial success evidence as a secondary consideration is a de novo review by you in terms of the weight that you give it. And we would submit that on the facts of this case, you should find that these patent claims are obvious. Thank you very much. Thank you very much. That completes the argument. The case is submitted. And I thank counsel for both sides.